IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STEELWORKERS ) | |
| OF AMERICA, AFL-CIO-CLC, ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | Case No. CV-00-B-368-S |
| ) | |
| ALTEC INDUSTRIES, INC., ) | |
|     Defendant ) | |

## MEMORANDUM OPINION

Before the court are cross Motions for Summary Judgment filed by Plaintiff United Steel Workers of America, AFL-CIO-CLC ("USWA" or "plaintiff") and Defendant Altec Industries, Inc. ("Altec" or "defendant"). USWA seeks an order compelling Altec to arbitrate pursuant to the terms of a collective bargaining agreement between Altec and USWA. Altec denies that it agreed through the terms of its collective bargaining agreement ("agreement") with USWA to arbitrate the present dispute and asserts that the exclusive venue for resolving this dispute is the claims review process under the Employee Retirement Income Security Act of 1974 ("ERISA"), which has not been invoked. Altec seeks a judgment dismissing the action.

Upon consideration of the record, the submissions of the parties, the argument of counsel, and the relevant law, the court is of the opinion that the present dispute is not subject to arbitration under the collective bargaining agreement but is a claims dispute under the Altec Health Care Benefits Plan (the "Plan") that the parties agreed to resolve through ERISA's claims review process. Therefore, plaintiff's Motion for Summary Judgment is due to be denied and defendant's cross Motion for Summary Judgment is due to be granted.[1/]

---

[1/] At the conclusion of oral argument, the court informed the parties of its intention to grant
(continued...)

## I. FACTUAL SUMMARY

### A. The Bargaining Agreement

The USWA and Altec entered into a collective bargaining agreement effective June 8, 1998. (DX A1.)[2/] The agreement contains, in Articles VII and VIII, a general grievance and arbitration procedure which provides that a grievance is a dispute "as to the meaning and/or application of a term or provision of [the] Agreement." (DX A2.) Article XXV of the agreement governs benefit plans available to Altec's covered associates (employees), including health, medical, and benefit plans. (DX A3.) The agreement provides that Altec will continue the group medical and health care plan of its associates "at the same or equivalent level of benefits in effect as of May 1, 1998." (DX A3.) Section 4 of Article XXV provides that "[a]ll matters connected

---

[1/](...continued)
summary judgment in favor of defendant. The court requested that counsel for defendant prepare a proposed memorandum opinion for the court and required that counsel send a copy of the proposed opinion to counsel for plaintiff. Although the court has made some changes to the opinion prepared by defendant's counsel, it has adopted a large part of the proposed opinion. The court is aware of the admonition of the Eleventh Circuit that district courts not delegate "the task of drafting important opinions to litigants." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1373 n.46 (11th Cir. 1997). This is an important opinion and the court had reached a firm decision as to the appropriate outcome before requesting a proposed opinion from defendant's counsel. In this case, however, the defendant drafted the opinion according to the express instructions of the court as to its contents. These instructions were stated to defendant's counsel, with plaintiff's counsel present, following oral argument. For example, in defendant's Brief in Support of Its Motion for Summary Judgment, defendant argued that plaintiff had failed to comply with the time deadlines required by the agreement between the parties. *See* Def's Br. at p. 16. At oral argument the court informed counsel that it disagreed with this argument and instructed defendant's counsel that when drafting the proposed opinion it should not include this argument as a basis for granting summary judgment. The proposed opinion followed the court's instructions in this regard. Although largely taken from the opinion proposed by defendant's counsel, the court personally reviewed this opinion and the opinion reflects the court's own conclusions.

[2/]Throughout this opinion references to Plaintiff's exhibits will be cited as "PX" followed by the corresponding tab; references to Defendant's exhibits will be cited as "DX" followed by the corresponding tab.

with the payment of benefits and administration of the coverages afforded by the plans . . . shall be governed solely by the terms of such policies." (DX A3.)

**B. The Plan**

A prescription drug program was a part of the Plan in effect on May 1, 1998. (DX A at ¶6; DX A4.) The prescription drug program, as it existed at that time, did not provide coverage for all prescription drugs. (DX A4.) For instance, the Plan specifically excluded coverage for "experimental or investigational drugs unless approved by Altec" or for "experimental drugs (not FDA approved)." (*Id.*) All covered drugs were subject to annual deductibles and co-payments. (*Id.*)

Altec, the administrator of the Plan, was vested with "the fiduciary discretion to determine eligibility for benefits under the Plan and all decisions of the Plan Administrator [were] final and binding." (DX A at ¶ 23 and DX A15.) The Plan which was in effect at Altec on May 1, 1998, included a Claims Review Procedure whereby denials of claims or requests for benefits could be appealed. (DX A5.) The Plan did not include any provision for arbitration but it did provide, in accordance with ERISA, 29 U.S.C. §1132, that Plan participants could file suit regarding benefits and the Plan administrator's actions. (DX A15, p. 6.)

**C. The Celebrex Controversy**

Altec retained PharmaCare Management Services, Inc. ("PharmaCare") to administer claims for prescription drugs submitted by Altec's employees (DX A at ¶9). Prior to August 15, 1999, the drug plan did not include an indication of specifically included or excluded drugs. (DX A4.) The plan covered drugs "which require a physician's written prescription and are medically necessary for the treatment of an injury or illness." (*Id.*) The plan excluded drugs such as over-

3

the-counter products, inpatient medications, contraceptives, certain experimental drugs, and others. (*Id.*)

By letter dated April 1, 1999, PharmaCare informed Altec that a new drug, Celebrex, had been introduced to the market in mid-January 1999; that the drug had been developed to overcome the side effects associated with many non-steroidal anti-inflammatory drugs ("NSAIDs");[3] that the Food and Drug Administration had withheld approval of certain product labeling regarding side effects, and that the costs associated with the drug were "unacceptable" given what "little proof" exists about the effectiveness of such drugs and given the availability of more cost effective drug therapies. (DX A at ¶ 10; DX A6.) PharmaCare further recommended that Altec immediately instruct PharmaCare as to how to treat Celebrex under the Plan and suggested possible courses of action for the company. (DX A at ¶ 10; DX A6.) Exercising its discretion as Plan administrator, Altec instructed PharmaCare to exclude the drug Celebrex from coverage effective May 1, 1999, until further notice (DX A at ¶11.)[4]

In 1999 Bruce Lewis ("Lewis") and Lawrence Jacques ("Jacques") were Altec employees who were members of the bargaining unit represented by USWA and were covered under the Plan and the prescription drug program. (DX A at ¶8.) On April 9, 1999, Jacques obtained a

---

[3] NSAID's are most often prescribed to regulate the pain and inflammatory effects of arthritis and other conditions. (DX A6.)

[4] Effective August 1, 1999, Altec revised its prescription drug program to create a new category of prescription drugs, "proprietary designated drugs," and instructed PharmaCare to reimburse employees 25% of the cost for such drugs. There was no deductible applicable to proprietary designated drugs. (DX A at ¶17; DX A11.) Plaintiff, in brief and at oral argument, attempts to assert that the creation of this new category of drug is what it really seeks to arbitrate. But the creation of this new category occurred after the events that gave rise to the filing of the grievance and after the filing of the grievance itself.

prescription of Celebrex from a pharmacy. (DX B, Answer to Inter. 2.)[5/] On May 21, 1999, twenty days after the effective date of Altec's decision to exclude Celebrex from further coverage and approximately six days before the filing of the May 27, 1999, grievance, Jacques attempted to obtain a refill of Celebrex, and the pharmacist told him that the drug was not covered. (*Id.*; Exhibit 2 to PX 1.) Jacques again attempted to obtain a refill of Celebrex on May 30, 1999, and was again told by his pharmacist that the drug was not covered. (DX B, Answer to Inter. 2.) Similarly, Lewis claims his request for benefits under Altec's Plan was denied when he tried to fill a prescription for Celebrex for his wife, Donna Lewis, on or about June 19, 1999, approximately twenty-three days after the grievance was filed. (*Id.*) In August 1999 he again requested benefits and was informed that Celebrex was only partially covered. (*Id.*)

On or about May 27, 1999, USWA filed a grievance report with Altec on behalf of Lewis and Jacques (PX 1 at ¶5 and Exhibit 2 thereto; DX A at ¶13.) That document, which was assigned the number AL14-11-99, alleged that Altec violated the collective bargaining agreement by its "[f]ailure to fulfill Prescription Drug Program benefits to associates which was agreed on in the present contract" and requested that Altec "[f]ulfill all obligations to this Prescription Drug Program." (DX A8.) Neither Jacques nor Lewis ever utilized the claims review procedure set forth in Altec's Plan in connection with their claims for Celebrex. (DX A at ¶24.)

On August 26, 1999, Altec provided a written response to grievance AL 14-11-99 indicating that it was being sent "[i]n response to the 3rd step meeting held on grievance 14-11-

---

[5/]The prescription drug program appears to have been a "pre-paid" program. Before filling prescriptions, the pharmacist queries the plan administrator or its agent to ascertain whether the drug is covered. If the drug is not covered, the customer pays for the drug out of his or her own pocket.

99 . . . ." (DX A at ¶19; DX A12.) On September 28, 1999, Rip Williamson, on behalf of USWA, submitted a request for arbitration of the grievance to Altec. (DX A13.) Altec responded on October 4, 1999, declining to arbitrate the matter and insisting that it should have been pursued through the Plan's administrative claims review procedure rather than through the grievance process. (DX A at ¶¶ 20, 21; DX A13, DX A14.) USWA then filed the present suit to compel arbitration.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F. 2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in its favor. *Id.* Nevertheless, the

nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III. DISCUSSION

A.  **The Law Applicable to Agreements to Arbitrate**

The principles applicable to determining whether Altec and USWA agreed to arbitrate decisions regarding the denial of benefits under Altec's Plan were set forth by the United States Supreme Court in 1960 in the *Steelworkers Trilogy*: *Steelworkers v. American Manufacturing Co.*, 363 U.S. 564 (1960); *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960); *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593 (1960), and were more recently discussed in *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643 (1986). The first principle "is that 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *AT&T*, 475 U.S. at 648 (quoting *Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 570-71 (1960) and *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). The second principle is that the determination of whether the parties have agreed to arbitrate a particular dispute is a matter for judicial determination. *See AT&T,* 475 U.S. at 649 (citations omitted); *Montgomery Mailers' Union 127 v. Advertiser Co.*, 827 F.2d 709, 712 (11th Cir. 1987).

The third guiding principle from the *Steelworkers Trilogy* is that "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims." *AT&T*, 475 U.S. at 649. The final guiding principle is that "where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may

7

be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *AT&T*, 475 U.S. at 650 (quoting *Warrior & Gulf*, 363 U.S. at 582-83). Even if a collective bargaining agreement contains a broad arbitration clause, however, a matter is not subject to arbitration if it is expressly excluded or if there is "forceful evidence of a purpose to exclude the claim from arbitration." *Id.* (quoting *Warrior & Gulf*, 363 U.S. at 584-85).

**B.     The Operative Provisions of the Agreement and Plan**

The collective bargaining agreement between USWA and Altec contains a general grievance procedure in Articles VII and VIII. However, payment of benefits and the administration of coverages of the Plan, including the Prescription Drug Program are governed by Section 4 of Article XXV of the Agreement, which provides that "[a]ll matters connected with the payment of benefits and administration of the coverages afforded by the plans . . . shall be governed solely by the terms of such policies." (DX A3.) The terms of the Plan vest in Altec, as administrator, broad discretion to supervise the operation of the Plan, to interpret the provisions of the plan, and to arrange for and exercise discretionary authority, when necessary, over the payment of benefits according to the Plan. (DX A15.) Altec has the fiduciary discretion to determine eligibility for benefits allowed by the Plan, and all of Altec's decisions as Plan Administrator are final and binding. (*Id.*)

USWA contends that Altec failed to maintain the health and medical benefits at the same level that existed on May 1, 1998, and that the grievance procedure provides the proper remedy for the company's action in decreasing the promised level of benefits. (Pl.'s Brief in Support of Motion for Summary Judgment at 12.) However, grievance AL 14-11-99 and USWA's

responses to interrogatories and the pleadings, including the summary judgment pleadings, indicate that USWA is actually challenging Altec's decision to deny claims for Celebrex, a decision that Altec made in its capacity as the administrator of its Health Care Benefits Plan. The grievance against Altec alleges a "[f]ailure to fulfill Prescription Drug Program benefits to associates which was agreed on in the present contract" and the remedy sought is that Altec "[f]ulfill all obligations to this Prescription Drug Program." (PX 1, tab 2.) USWA's interrogatory answers indicate that the dispute arose because some benefits for Celebrex were paid, but that coverage was later denied, and that Celebrex was only partially covered or that benefits for it were limited. (PX 5.) The crux of USWA's complaint clearly arises from Altec's decision to deny claims for Celebrex, a drug which was not available and, therefore, not covered by the Plan in effect on May 1, 1998.

C.   **Application of the Steelworkers Trilogy Principles**

The determination of whether USWA and Altec agreed to arbitrate the particular dispute is one for the court and should be made without consideration of the merits of the underlying claims. *See AT & T*, 475 U.S. at 649 (citations omitted). Although there is a presumption in favor of arbitrability, the court must look to the agreement between Altec and USWA to determine if the dispute over the denial of coverage of benefits for a particular drug, Celebrex, is one that the parties agreed to arbitrate or whether they have excluded this type of dispute from the general arbitration provisions. *See id.* at 650 (citations omitted).

Other courts faced with similar facts have found that such claims were not subject to arbitration under the applicable collective bargaining agreements. In *United Steelworkers of America, AFL-CIO-CLC v. Commonwealth Aluminum Corp.*, 162 F.3d 447 (6th Cir. 1998),

USWA filed an action to compel an employer to arbitrate five grievances that related to the denial of group insurance benefits under the grievance and arbitration provisions of a collective bargaining agreement. *Id.* at 448. The agreement in question contained a broad four step grievance and arbitration procedure, similar to the broad arbitration provision in Articles VII and VIII of the agreement between Altec and USWA. *See id.* at 448-49. In addition, the *Commonwealth Aluminum* collective bargaining agreement included an agreement to provide group insurance benefits and specifically incorporated the existing benefit plans. *Id.* at 449. The benefit plans expressly gave the administrator discretionary authority to construe and interpret the terms and provisions of the plan, to make benefit determinations, to decide questions of plan interpretation and provided that the administrator's decisions were to be final and binding. *Id.* This is the same type of authority and final and binding decision-making provisions found in Altec's Plan.[6]

Like the agreement between Altec and USWA,[7] the collective bargaining agreement in *Commonwealth Aluminum* provided that there were no oral agreements between the parties which changed, added to or deleted from the terms of the collective bargaining agreement. *Id.* at 449. The union filed grievances over the denial of benefits under the health care benefits plans. *Id.* at 450. The employer contended that disputed claims for benefits had to be appealed through the claims review procedure set forth in the plan, rather than the grievance procedure in the collective bargaining agreement. *Id.*

---

[6] The Altec plan document also informed participants that they had the right to file suit in state or federal court if a claim for benefits was denied or ignored, in accordance with the provisions of ERISA, 29 U.S.C. §1132 (a)(1)(B).

[7] *See* Article I, Section 3 of agreement (PX 1, tab 1).

The Sixth Circuit, following decisions of the Seventh Circuit in *International Association of Machinists and Aerospace Workers v. Waukesha Engine Division, Dresser Industries, Inc.*, 17 F.3d 196 (7th Cir. 1994) and the Fifth Circuit in *Local No. 4-449, Oil, Chemical and Atomic Workers v. Amoco Chemical Corp.*, 589 F.2d 162 (5th Cir. 1979), held that the claims relating to denial of medical plan benefits were not subject to arbitration under the terms of the collective bargaining agreement despite the general rule that doubts resolving arbitrability should generally be resolved in favor of arbitration. *Id.* at 448. The Sixth Circuit held that by incorporating the employer's benefits plan, which included a claims review procedure and expressly provided that the decisions of the plan administrator were to be final and binding, the parties expressed an intention to exclude from the general arbitration provisions of the collective bargaining agreement all disputes over benefits which were within the plan administrator's authority. *Id.*

In *Amoco*,[8] the collective bargaining agreement at issue included grievance and arbitration provisions regarding the processing of grievances, the selection of arbitrators, and the arbitration procedure. *Local No. 4-449, Oil, Chemical and Atomic Workers v. Amoco Chemical Corp.*, 589 F.2d 162 (5th Cir. 1979). It also provided that sickness and disability benefits would be paid, during the term of the collective bargaining agreement, in accordance with the sickness and disability benefits plan that was in effect at the time the parties entered into their collective bargaining agreement. *Local No. 4-449*, 589 F.2d at 163. The existing benefits plan reserved to the board of directors of the company the right to interpret, apply, amend or revoke the plan at any time and provided that the decisions of the board regarding administration of the benefits

---

[8] The Eleventh Circuit has adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981. *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

11

plan were to be final. *Id.* The union sought to compel arbitration of grievances contesting the denial of sick pay benefits. The Fifth Circuit, relying on the unequivocal language of the plan and the power vested in the administrator, found that the agreement excluded grievances dealing with sickness and disability benefits from the grievance and arbitration procedures of the collective bargaining agreement and refused to compel arbitration. *Id.* at 163-64.

Similarly, in *Waukesha*,[9] a union filed a complaint to compel arbitration over a grievance relating to medical benefits. *International Ass'n of Machinists and Aerospace Workers v. Waukesha Engine Div., Dresser Indus., Inc.*, 17 F.3d 196 (7th Cir. 1994). The collective bargaining agreement in question expressly incorporated a medical benefits plan which vested broad discretion in the plan administrator. *Waukesha*, 17 F.3d at 198. The plan administrator granted several requests for precertification of hospital stays on behalf of a participant but later denied a request because it concluded that hospitalization was not "medically necessary." *Id.* at 197. The plan administrator believed that the terms of the medical benefits plan gave it the right to make such a determination. *Id.*

The Seventh Circuit reviewed the language of the collective bargaining agreement and the benefits plan and determined that the parties "did not intend to subject determinations of medical necessity to arbitration." *Waukesha*, 17 F.3d at 198. The collective bargaining agreement required the company to continue to provide the level of employee insurance coverage which existed at the time the agreement was entered. *Id.* The summary plan description for the employee insurance plan provided that the company determine the medical expense benefits

---

[9] *See* also *Printing Specialities and Paper Products Union Local 680, Graphic Communication International Union, AFL-CIO v. Nabisco Brands, Inc.*, 833 F.2d 102 (7th Cir. 1987) (court found "a wealth of forceful evidence" of a purpose to exclude claims from arbitration).

under the plan. *Id.* A plan participant could appeal a denial of benefits and could also file suit in federal or state court. *Id.* The Seventh Circuit found that the plan specifically provided for an alternative review procedure and, therefore, that the company and the union did not intend to arbitrate disputes regarding the denial of insurance benefits. *Id.* The Seventh Circuit rejected the union's argument that when the administrator refused to precertify the participant for hospital stay, the company violated its obligation "to continue to provide the present employee insurance coverage'" as required by the collective bargaining agreement. *Id.* The court found that the administrator merely denied a specific request for pre-certification, as it was authorized to do under the plan, and the participant continued to remain eligible for and receive coverage under the plan. *Id.* As a result, the dispute did not implicate any terms of the collective bargaining agreement and was not subject to arbitration. *Id.* at 199.[10]

**D.  Altec and the USWA Did Not Agree to Arbitrate the Present Dispute**

Although USWA contends that the dispute at issue concerns defendant's failure to maintain pharmacy benefits at the May 1998 level and that the matter should be determined by an arbitrator, plaintiff's complaint is based on Altec's denial of specific requests for benefits under the Plan. The court is of the opinion that arbitration of the dispute at issue here was not agreed to by the parties. Article XXV of the collective bargaining agreement between Altec and USWA provides that disputes regarding benefits under Altec's plans are not subject to arbitration. Altec committed to maintain its medical and health care benefits plans at the same or equivalent level that was in effect as of May 1, 1998, and USWA specifically adopted Altec's existing health,

---

[10] The fact that the administrator had granted several precertifications then denied one is analogous to the present case where benefits were provided at times for Celebrex but were later denied.

13

medical and dental plans. These existing plans gave the administrator the ability to make final and binding decisions regarding eligibility and coverage of the Plan. They provide an administrative claims review procedure that participants may use to contest their entitlement to benefits and confirm that participants may file suit to challenge the plan administrator's actions. Furthermore the agreement between USWA and Altec specifically states that "[a]ll matters connected with the payment of benefits and administration of the coverages afforded by the plans . . . shall be governed solely by the terms of such policies." This language demonstrates that Altec and USWA never agreed to arbitrate claims relating to the payment of benefits or coverages offered under the health care benefits plan and prescription drug program.[11/]

## IV. CONCLUSION

For the foregoing reasons, the court concludes that no genuine issues of material fact exist and that defendant is entitled to judgment as a matter of law. An Order denying plaintiff's Motion for Summary Judgment and granting defendant's cross Motion for Summary Judgment will be entered contemporaneously herewith.

DONE this 26th day of March, 2002.

*Sharon Lovelace Blackburn*
SHARON LOVELACE BLACKBURN
United States District Judge

---

[11/]Even if Article XXV is not construed as an express exclusion from arbitration, it is "forceful evidence of a purpose to exclude the claim from arbitration," and the court would reach the same decision regarding the necessity for arbitration. *See AT & T*, 475 U.S. at 650 (citation omitted).